UNITED STATES DISTRICT COURT
IN THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-15-00179-TSZ |
| Plaintiff, | |
| vs. | DEFENDANT SATYEN CHATTERJEE'S SENTENCING MEMORANDUM |
| SATYEN CHATTERJEE, | |
| Defendant. | |

## I.   **INTRODUCTION**

Sentencing in this matter is set for 9:00 a.m. on Wednesday, March 23, 2016. The government is represented by AUSA Justin Arnold and Robert Kondrat, a Special AUSA who is Chief of the Criminal Unit of the Enforcement Unit of the Department of Financial Institutions for the State of Washington ("DFI"). The defendant was originally represented by Peter J. Avenia, an Assistant Federal Public Defender. Mr. Avenia pled the defendant guilty to a one count Information on May 18, 2015. Due to his health problems, which included emergency surgery and potential blindness, Mr. Avenia withdrew and was replaced by Dennis Carroll of the Federal Public Defender's Office. By this point, defendant understood the impact of his plea and expressed a desire to withdraw it, so Mr. Carroll withdrew. Panel attorney Lee Edmond was

appointed to represent Mr. Chatterjee and moved to withdraw his guilty plea, which was denied on December 17, 2015. On January 11, 2016, the Court permitted Lee Edmond to withdraw as counsel and granted defendant's Motion to Substitute James Frush as Counsel for the Defendant, and reset the sentencing for March 23, 2016.

## II.    THE DEFENDANT AND HIS FAMILY

Satyen Chatterjee is sixty-five years old. Satyen has been married to his wife, Paramita, for almost forty years. The Chatterjees have two sons. The oldest son, Subhadeep, age thirty-six, graduated from UW with a degree in electrical engineering, resides in Seattle, and works as a vice president and marketing executive for [24] 7, an information technology company. He and his wife Jill have a daughter, Amia, age 20 months, Satyen's only grandchild. Satyen's younger son, Saurav, age thirty-two, graduated from the Honors Program at UW in computer science, earned a Masters from Cornell University in computer science, and works for Box Inc., an information management company in San Francisco.

The two sons have been financially assisting the defendant for years and have retained current counsel for Mr. Chatterjee. His oldest son, Subhadeep, and his wife Jill were very active in the creation of Metamune Inc. dba Bodymune ("Metamune") and the marketing of the Bodymune products made by Metamune. Subhadeep is currently the CEO of Metamune.

Satyen's wife, Paramita, developed health problems in 2012 and was diagnosed with breast cancer in January of 2013. Uterine cancer was also suspected, and in March, 2013, she underwent hysterectomy and lumpectomy surgeries. Her health remains marginal today and she cannot live alone. She experiences blackouts and is occasionally bedridden. Satyen is her primary caregiver and has been since her health began failing in 2012.

DEFENDANT SATYEN CHATTERJEE'S SENTENCING
MEMORANDUM - 2
[CASE NO. CR-15-00179-TSZ]

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

### III.  DEFENDANT'S BACKGROUND

Satyen was born in the Bengal region of eastern India, located at the head of the Bay of Bengal. Three years before his birth, the region was partitioned with West Bengal and its Hindu population becoming an Indian State and East Bengal and its Muslim population becoming part of Pakistan and later Bangladesh. Satyen is still close to his three remaining siblings who live in India, visiting them when he can.

Excelling in school, Satyen secured a national scholarship and had the opportunity to obtain an engineering degree from the Indian Institute of Science in Bangalore, the CalTech of India. In 1979, Satyen and his family, including his first son, moved to Zambia, Africa where he worked as an engineer for eight years. Their second son was born in Zambia. While working in Zambia, Satyen was inducted as a member of the Institution of Mining and Metallurgy, London, for contributions to metallurgy. He also became a Chartered Engineer, London, 1983.

Concerned about his sons' future, Satyen gave up a well-paying engineering job to immigrate to the United States in 1987, relocating in Seattle because he was admitted to UW and was promised a teaching assistantship. At UW, the defendant earned his Master's Degree in Business Administration. He went on to join the faculty at the Foster School of Business Administration for several years. The entire family are naturalized American citizens.

### IV.  COMMUNITY SERVICE OF DEFENDANT

Satyen has always had a particular interest in providing educational opportunities to impoverished children. In India, if you are poor it doesn't matter how smart you are, you are going to be working in the fields or in some other form of child labor before you reach your teens. Education costs money and is not generally available to the poor.

DEFENDANT SATYEN CHATTERJEE'S SENTENCING
MEMORANDUM - 3
[CASE NO. CR-15-00179-TSZ]

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

In 1983, Satyen began earning a very good living in Zambia, he helped establish and fund an educational and boarding facility called Akash in his hometown of Jhargram in West Bengal. The school was originally focused entirely on providing free boarding and coaching for poor but brilliant children. They were collected from small villages, in the midst of deep poverty. Over the years, the high educational achievements of Akash have also attracted wealthy parents. Now the school is largely self-funded as the school charges the wealthy market fees for 30% of the student body selected through a competitive entrance examination. Satyen has also worked with the alumni, many of whom are professors, doctors, and engineers, to provide voluntary service to the school. Satyen has continued to financially support and visit the school for over thirty years.

In Zambia, Satyen was active in the local Rotary Club, dealing with medical, disability and, educational issues.

When Satyen relocated to Seattle in 1987, Satyen was active in his church. He helped his oldest son introduce the youth Rotary Club for the first time in a Seattle public school.

For two years, 1991-92, Satyen was the Treasurer of the Indian Association of Western Washington. The Association was involved in philanthropic work, including donating food items to local food banks.

From 2010 through 2013, Satyen was a board member of the Federation of Indian American Associations which is active providing social services. Through the Association, Satyen was involved in was the dedication of a statue of Mahatama Gandhi at the Bellevue Central Library.

In 2010, Satyen was elected as Vice President of Uttoron, a Bengali community organization of the greater Seattle area. In January, 2011, he became President of Uttoron. During his tenure, he introduced a philanthropic program for the young people of the community. Now, thirty to forty young members routinely give voluntary tutoring services at their schools or work in food

DEFENDANT SATYEN CHATTERJEE'S SENTENCING
MEMORANDUM - 4
[CASE NO. CR-15-00179-TSZ]

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

banks as a group. Satyen felt it important that the young be willing to serve and obtain joy from it.

## V.    STRATEGIC CAPITAL MANAGEMENT

In 1993, Satyen founded Strategic Capital Management, Inc. ("SCM"). SCM was a registered investment advisor. Apart from part time clerical help, Satyen ran SCM by himself. Between 1995 and 2004, SMC had approximately $15 to $20 million dollars in assets under investment.

SCM provided two types of services. In discretionary asset management services, the client gave SCM a limited power of attorney to trade in the client's account and to manage the account on the client's behalf. In the non-discretionary type of service, SCM simply advised the client on the selection of securities and the client took action on his own. Compensation to SCM was completely fee based, calculated on either the assets under investment, the performance of the accounts, or both. SCM never served as custodian for client funds.

Much has been made by the DFI and the government concerning transfers in and out of the SCM trading account and the SCM checking account. It is a general misunderstanding, if not misstatement of the facts, to imply that either one of these accounts ever held client funds. The mechanism for client management for all accounts at SCM required the client to open an online brokerage account with a brokerage company such as E*Trade or Charles Schwab which could provide online trading at a competitive price.

At the end of every month, SCM would bill the clients for its management fees and the client would either authorize a payment from the investment account to SCM or make a payment directly to SCM for its fees. A brochure describing SCM and its methods of operation dated May 22, 2012 is attached as Exhibit 1 to Defendant's Exhibits Submitted at Sentencing (hereinafter "Exhibit"). Exhibit 2 is a sample Investment Advisory Agreement.

DEFENDANT SATYEN CHATTERJEE'S SENTENCING
MEMORANDUM - 5
[CASE NO. CR-15-00179-TSZ]

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

Promissory notes were never employed by SCM or by Satyen in the operation of SCM's advisory business. Furthermore, promissory notes were never offered by SCM as investment vehicles for its customers.

With the market turmoil in 2007 followed by the recession beginning in 2008 and extending into the several years that followed, SCM's business deteriorated both because client accounts lost value and clients also withdrew their money from the market. At the end of December 2011, the amount of assets managed by SCM on a discretionary basis was $784,000 and on a non-discretionary basis $1,540,000. As SCM was a fee based advisor, its income dropped significantly. According to its January 29, 2013 ADV filing, SCM managed only fourteen accounts on a discretionary basis with total assets under management of $865,000.

## VI.  SATYEN'S ISSUANCE OF PERSONAL PROMISSORY NOTES

Beginning in approximately 2007, Satyen began borrowing money from individuals, some of whom were SCM clients, using promissory notes which contained a fixed rate of interest. These promissory notes were issued and guaranteed by Satyen and do not reflect that SCM was involved in either their issuance or guarantee. Exhibit 3. It is true that Satyen would, on occasion, have these lenders make checks out directly to SCM or that he would deposit the checks into SCM's accounts. Satyen's understanding was that as a single owner of a sub-chapter S Corporation, any tax consequences flowed directly to him. It should also be remembered that there were no client funds ever contained in the SCM checking or trading account.

In discussing these promissory notes, Satyen would refer to them as a "fixed investment" or "fixed income investment" as he viewed the notes as providing a fixed return. Obviously the

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

return on those notes was income. Satyen was unaware that under Washington State Security

laws these notes could be considered securities.[1]

Satyen and his wife had purchased a comfortable home in Meadowbrook near the University

District which had appreciated significantly over the years. Satyen always felt that the equity in

his home was more than substantial to make good on all the promissory notes he issued. In

addition, he felt he had access to "ancestral lands" in India and his sister had advised that she

would sell her house in India if required to help repay the lenders. Satyen also thought that his

start up nutritional business Metamune would become successful. He also relied on his sons to

help if need be.

As time progressed, Satyen's financial situation worsened and he was unable to make the

required interest payments on the notes or redeem them when demanded. If he had not been

registered as an investment advisor, and if some of the lenders had not known of that status, it is

interesting to speculate whether he would be here today. The result may have simply been the

filing of numerous civil suits by the lenders (which did occur, resulting in judgments that became

liens on his residence). However, some of the lenders complained to DFI and as, under

Washington State law, these types of notes can be considered securities, DFI began an

investigation.

In August 2012, DFI received on-line complaints from Sajib Dutt on behalf of himself, his

wife (Preeti) and father-in-law (Prakash Deshmukh). In October 2013, DFI suspended SCM's

investment advisory registration and issued an order to cease and desist and provided Notice of

---

[1] Satyen's lack of understanding that these notes could be considered securities, particularly because he owned and operated SCM which was registered investment advisor, was underscored by the findings of the DFI in their investigation indicating that he did not disclose these investments or the related activities on the SCM's ADV, did not include these liabilities on balance sheets for SCM and that if they had been so reflected, he was failing to maintain his required minimum net worth, and failed to maintain any SCM books and records relating to these promissory notes.

DEFENDANT SATYEN CHATTERJEE'S SENTENCING
MEMORANDUM - 7
[CASE NO. CR-15-00179-TSZ]

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

Intent to Revoke Registration for Satyen and SCM. On June 8, 2014, Satyen and DFI entered a Consent Order under which Satyen and SCM neither admitted nor denied any facts or conclusions but agreed that the investment advisory registration for both SCM and Satyen would be revoked.

## VII.    PROMISSORY NOTES IN THE FEDERAL CRIMINAL CASE

It is important to note that some of the promissory notes issued by Satyen were paid in full, both as to principal and interest. Not all of the funds used to make these payments came from the issuance of additional notes. While Satyen's earnings were diminished, they were still available for either servicing or redeeming the notes. Satyen's sons also helped with his financial situation. Lastly, as discussed more fully below, Satyen sold portions of his nutritional supplement business Metamune and had modest compensation paid to him by Metamune.

By the time the criminal case was filed, and this matter has proceeded to sentencing, there are only loans outstanding. As DFI claims that notes for approximately $800,000 were issued, apparently $640,000 of principal and the corresponding interest had all been repaid.[2] The government, in its Sentencing Memorandum, lists a total of $90,594 due for these four lenders. However, three of these lenders have been paid interest in a total amount of $27,750. And three of these four victims have been paid a total of $168,376 in principal. In all, the defendant has paid $196,126 towards these loan amounts of $260,000. Essentially, PS and TS should be eliminated as a victim as they have been overpaid the amount they loaned by $4,000. That would leave three couples or three victims with a net loss of $63,874, (or $67,874 if credit is not given for the overpayment to PS and TS). These calculations are described in the spreadsheet below.[3]

---

[2] Much of the $800,000 was probably reflective of notes which were reissued at the end of their typical one year term. This type of pushing numbers was often used by DFI.
[3] Counsel plan to confer before sentencing to determine whether they can agree on payments previously made by Satyen.

DEFENDANT SATYEN CHATTERJEE'S SENTENCING
MEMORANDUM - 8
[CASE NO. CR-15-00179-TSZ]

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

| Lender | Loan Amount | Date | Principal Paid | Interest Paid | Total Paid | Gov't Loss | Net Loss |
|--------|-------------|------|----------------|---------------|------------|-----------|----------|
| SB and PB | $20,000 | | 0 | 0 | 0 | $20,000 | $20,000 |
| PD1 and PD2 | $50,000 | | $13,376 | $6,750 | $20,126 | $36,624 | $29,874 |
| SD1 and PD3 | $50,000 | | $25,000 | $7,000 | $32,000 | $23,970 | $18,000 |
| PS and TS | $140,000 | | $130,000 | $14,000 | $144,000 | $10,000 | ($4,000) |
| **TOTALS** | **$260,000** | | **$168,376** | **$27,750** | **$196,126** | **$90,594** | **$63,874** |

The defense and the government are in agreement that, for purposes of ordering restitution, all payments made by the defendant toward the obligation, whether interest or principal, is applied to the restitution amount. That is, Satyen gets credit for interest payments against restitution.

The defense objects to claiming a single promissory note as having at least two victims, the partners of the marital community. The Application Note 1 to USSG § 2B.1.1 does not speak to married couples. In *U.S. v. Harris*, 718 F.3d 698, 702-03 (7th Cir. 2013), all the investment accounts held by the married couples were held jointly and the issue was immaterial as the guideline range did not change whether the couples were counted as a single victim. *U.S. v. Ellison*, 522 F.3d 1255, 1275 (11th Cir. 2008), dealt with whether the victims were schools or the students and parents who had purchased tickets. Married couples were not an issue.

Here, Satyen did not deal with the couples when setting up the loan, and of the notes at issue, some do not name both marital members, for example Sarmistha De and Pratibha Deshmukh were not listed as payees on the notes.

The government's loss table contained in its Sentencing Memorandum lists Parantap Lahiri as one of the "fixed investment" victims. As is shown below in the Metamune discussion, this was not a fixed investment in the fashion of the other loans that were made by promissory notes

DEFENDANT SATYEN CHATTERJEE'S SENTENCING MEMORANDUM - 9
[CASE NO. CR-15-00179-TSZ]

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

executed by Satyen. Lahiri had made loans to Satyen without promissory notes and, as discussed below, turned some of those loans into a stock position in Metamune.

## VIII.   METAMUNE dba BODYMUNE

For almost fifteen years, Satyen Chatterjee worked on developing an organic dietary supplement. Satyen began looking at it as a potential business in 2009. This concept was eventually incorporated as Metamune, Inc. in March of 2012. It now does business as Bodymune.

Originally, Satyen, as is common in his native culture, took organic supplements purchased in India. He also began producing supplements for a group of boys and girls in India at the Akash School he was supporting. Satyen began compounding ingredients in both the United States and in India. His work in this area was inspired by the cholesterol problems he suffered and his wife's developing and serious arthritis problems. Satyen researched different developments in different cultures and eventually found 25 to 30 ingredients which he then studied in reaction to each other. His first supplements were Cardiomune and Bodymune.

Satyen's original "partners" in Metamune were Parantip Lahiri and Pritam De. Every partner was supposed to bring some talents and work to Metamune along with some money or "skin in the game" to help the venture succeed.

Satyen met Parantap Lahiri socially and was generally impressed by his hardworking nature and his ability to manage logistical details. Satyen also had managed a small investment account through E*Trade for him. Lahiri worked as a product director at Microsoft. During mid-2011, at a social picnic, they were discussing health issues as Satyen had recently turned sixty years old. Satyen casually mentioned the development of the Bodymune supplement which he had been taking for two years and indicated it might soon come to market in the United States. Like many

DEFENDANT SATYEN CHATTERJEE'S SENTENCING
MEMORANDUM - 10
[CASE NO. CR-15-00179-TSZ]

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

investors, Lahiri tried the product for a month or so and said he wanted to buy part of the company from Satyen. It was Lahiri who actually selected the name Metamune for the company before they incorporated it on March 1, 2012.

Lahiri had been an informal lender to Satyen as a friend, not involving promissory notes, and not as part of the promissory note process. Lahiri wanted to turn some of his loans to Satyen into equity in Metamune. Before Metamune was actually incorporated, Lahiri converted $100,000 of his loans to buy 5% of the company from Satyen, who at that point owned 100% of it. Lahiri was to assist with logistics and technology support and has remained an active participant. He joined the board of directors in May, 2015 after Satyen was arrested. Lahiri ended up advancing another $60,000 but, rather than taking an equity position, did it as a loan to the company in June, 2014.

Satyen had met Pritam De socially, but Lahiri brought him in to the Metamune circle. Satyen met with him a few times at Lahiri's house where De discussed his skills in launching products on Amazon. Satyen felt De would be a good fit for the core group and sold 2.5% of his shares to De for $50,000 in September, 2012. De was responsible to launch the product on Amazon.

This core group of three was formed and was responsible for the drafting and signing of the Memorandum of Understanding and the Shareholders Agreement before inviting other outside investors. As noted above, the core group was Satyen, Lahiri, and De. A copy of their Memorandum of Understanding, dated August 2, 2013 is attached as Exhibit 4. That Memorandum reflects the ownership before additional parties joined.

When the company was formed, its prospects looked bright. The product was soon accepted in Bartell drug stores under a one year contract and was also available on Amazon. At that point, all parties valued the company at $2 million dollars.

DEFENDANT SATYEN CHATTERJEE'S SENTENCING
MEMORANDUM - 11
[CASE NO. CR-15-00179-TSZ]

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

Others in addition to the core group wished to participate, including Sundip Gorakshakar, who invested $25,000 for a 1.25% equity stake in August of 2013. Gorakshakar showed early interest from 2011 as others came to know about the supplement product through product use. Gorakshakar had severe psoriasis and arthritis problems. He held a high security clearance at Boeing where he worked and was Chairman of the Federation of Indian American Associations. He and his sister were greatly helped by the supplement. He gave testimonials to that effect in 2012, both by means of a letter and by a video. See Exhibit 5. He provided a total of $25,000 which he invested for a 1.25% stock purchase from Satyen.

Satyen had met Mohan Shah through the Vedanta Society. Satyen agreed to manage a small portfolio for Shah without charging any management fees because they were co-members of the Vedanta Society. His account did exceptionally well during the first year. After the Metamune products were successfully launched at Bartell, Satyen and Shah discussed Shah's interest in investing in Metamune. At that time, everyone was highly optimistic about its prospects. While it was intended there would be an equity investment, and Shah and quickly deposited $20,000, he developed cold feet and wanted to take his position as a loan.

Shah provided three checks totaling $20,000.[4] He provided the three checks because he was uncertain as to how much he actually wanted to invest. He claimed he could use his "connections" to launch the product in India. Satyen thought that these connections were questionable and was trying to market in India through an established pharmaceutical company with De and a separate pharmaceutical company with Lahiri. This appeared to anger Shah. He got cold feet as the Bartell launch and the Amazon posting didn't do as well as anticipated, and the principals agreed to allow him to turn his investment into a loan.

---

[4] Shah deposited the three checks in San Francisco and they were never seen by Satyen.

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

Indrajit Sur was invited by Lahiri into the group because he knew him professionally at Microsoft as well as Sur's previous work in various consumer product lines in India. Satyen didn't really know him except that he knew he worked at Microsoft and had a travel agency through which sometimes the Chatterjees used to buy air tickets to India. Regarding Metamune, Satyen first met Sur at Lahiri's Microsoft office in early April 2012. Sur indicated he wanted to buy 1 to 2 % of the company at the same rate that Lahiri invested. Sur created the slides for the Bartell presentation made on April 25, 2012, and was deeply involved in the company. He pledged $20,000 toward equity and deposited $10,000 on June 1, 2012, which appears to have been delayed because he wanted to make sure the Bartell order was received. He was going to purchase a total of 1% of the company for $20,000. He only put $10,000 up on June 1, 2012. On June 12, 2012, an email request was sent to him for the balance of his deposit. It never occurred. On August 13, 2012, Sur sent a bailout notice with an excuse that he badly needed the money because of reversals with his side job running a travel agency. Lahiri and Satyen were agreeable to paying him back from future sales and treat the $10,000 as a loan. When interviewed, Sur showed total ignorance about all these facts.

Although each of these Indian friends and acquaintances were supposed to provide some talent and work in addition to their financial contribution, they lost some enthusiasm when the Bartell and Amazon launches sputtered and eventually failed. Satyen and his son Subhadeep and his daughter-in-law Jill continued to work hard attempting to make the company a success. As described more fully below, Satyen succeed in bringing in true professionals who helped make the product and the company viable.

To save money, Satyen had been preparing and filling tax returns with the help of CPA Jessica Allen of Rain City CPA, PLLC since the inception of the company. K-1s issued for the

DEFENDANT SATYEN CHATTERJEE'S SENTENCING
MEMORANDUM - 13
[CASE NO. CR-15-00179-TSZ]

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

company for 2012 reflected a $45,000 distribution to the shareholders, which consisted of $42,750 to Satyen and $2,250 to Lahiri. The third partner, De, refused to give Satyen his Social Security number and did not want a K-1 reflecting a distribution to him of 2.5% or $1,125. The tax returns of Metamune contain compensation payments reflected on Form 1099s to Satyen for $18,000 in 2012, $13,880 in 2013 and $14,290 in 2014. The tax returns for 2012-14, including the K-1s and 1099s, which were contemporaneously created at the times they reflect, are attached as Exhibit 6. While Metamune has not generated profits, it has always been an ongoing concern and the activities and finances were well known to all of the participants who either invested money or loaned it money.

After the Bartell and Amazon launch fizzled out, Satyen attempted to get SBA Bank financing from Wells Fargo. Wells Fargo wanted the product manufactured in India or China as it was impossible to get liability insurance for the product if it was manufactured in the United States. As a result the SBA loan never materialized. See Exhibit 7 for emails relating to this process.

In 2011, application was made in conjunction with Santosh Kumar, M.D., to Bastyr University for clinical trials. It wanted over $60,000 in fees and intellectual rights to any products developed and the application went nowhere. See Exhibit 8.

In mid-2012, Satyen traveled to China. The purpose of the trip was to purchase the equipment and be trained. Equipment and manufacturing supplies were shipped from China as a result of this trip.

In August, 2013, Satyen was fortunate enough to partner with Stuart Ochiltree. Ochiltree joined Avon in 1968 and became its CEO and president. Avon was the largest direct selling company in the world, with over $4 billion dollars in annual sales. At the age of 41, Ochiltree

DEFENDANT SATYEN CHATTERJEE'S SENTENCING
MEMORANDUM - 14
[CASE NO. CR-15-00179-TSZ]

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

retired from Avon. Since retirement, Ochiltree has managed his own business, Global Partners, located in Montecito, California. He is also the Chairman of the Board and Chief Executive Officer of Univera Life Sciences, Inc. located in Lacey, Washington. Univera Life Sciences offers natural vitamins and fruit drinks and is supported by the Econet family of companies, all dedicated to researching human renewal. In addition to Avon and Univera, Ochiltree has also been connected in a business capacity with Recommerce Solutions SA, MLM Low-High KH, MyAgesLife.com Inc. and Maxell Biosigns Inc. Ochiltree remains very active in business and serves on several boards of directors including several small start-up businesses.

Ochiltree brought a new level of development and a far superior level of contacts and potential partners to Satyen and Metamune than Satyen and his group of Indian investors and lenders were able to develop. See Exhibit 9, 2014 Bodymune Business Plan. Ochiltree helped Satyen retain the law firm of DL Piper, who has filed pending patent applications for the products (now 7 in number). Exhibit 10. At the end of 2013, Stuart Ochiltree introduced Satyen to David Tsai, from Taiwan, in an effort to market the product in Taiwan. They attempted to set up a clinical tests in Taiwan. Also brought on board was Rick Cesari, who had experience launching Go Pro and SonicCare and experience in TV marketing. Josh Dirks of Project Bionic also became involved and referred Satyen to Michelle Barry, a branding expert with Centric/Brand Anthropology. Michelle brought in Tyler Jones, founding president of North American Seasonings, to help supervise production. Both Barry and Jones took equity positions in the company, as reflected below. Barry's contribution was limited to sweat equity valued at $73,000, while Jones invested $30,000 in 2014. A list of some of the individuals with whom Stuart was able to introduce Satyen to are contained on the business cards attached Exhibit 11 and include Robert May, M.D. of the Washington Association of Naturopathic Physicians, Rick

DEFENDANT SATYEN CHATTERJEE'S SENTENCING
MEMORANDUM - 15
[CASE NO. CR-15-00179-TSZ]

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

Cesari, of Cesari Direct, a direct marketing facility, Michelle Barry of Centric/Band Anthropology. Sadly, many of these connections and the involvement of others have been frustrated by the arrest of Satyen when many of the individuals found it necessary to step back from Metamune and Satyen.

In mid-2014, the group of Satyen, De, Lahiri, and Gorakshakar were working hard to both market the product, particularly through getting on "Groupon." See Exhibit 12, a series of emails from March and April 2014 indicating the hands-on involvement of all of these individuals in the company. Interestingly, De wanted to retain the valuation of $2 million dollars (March 31, 2014 at 4:25 p.m.) and Lahiri is concerned that people might invest "without skin in the game" (April 13, 2014 at 10:35 a.m.).

While Metamune originally had production facilities on Lake City Way, once Satyen was arrested he was required to distance himself from the company and abandoned all control to others. The products are now manufactured at a North American Seasoning facility located in South King County and supervised by Tyler Jones. The current board consists of Michelle Barry, Jones, and Lahiri. The current equity ownership and debt is reflected below.

|  | Number of Shares | % Holding |
|---|---|---|
| Satyen Chatterjee | 182,500 | 86.7808% |
| Parantap Lahiri | 10,000 | 4.7551% |
| Pritam De | 5,000 | 2.3776% |
| Sudip Gorakshakar | 2,500 | 1.1888% |
| Michelle Barry | 7,300 | 3.4712% |
| Tyler Jones | 3,000 | 1.4265% |
| | **210,300** | **100.00%** |

**Debt**

| Parantap Lahiri | $60,000 | 6/01/2014 | 10% annual rate |
|---|---|---|---|
| Indrajit Sur | $10,000 | 06/01/2012 | 10% annual rate |
| Mohan Shah | $20,000 | 07/01/2012 | 10% annual rate |
| Total Debt | **$90,000** | | |

DEFENDANT SATYEN CHATTERJEE'S SENTENCING
MEMORANDUM - 16
[CASE NO. CR-15-00179-TSZ]

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

Financially, matters have improved for Metamune recently. Exhibit 13 reflects that orders since November of 2015 total $66,477, with accepted orders at $45,477 and with $34,277 deposited in the bank. Subhadeep Chatterjee, current CEO, has forecast sales based on the activity of the last five months with cumulative totals for 2016 to 2018 reaching $4,615,757. Exhibit 14 and his Declaration filed herewith.

## IX. ESTABLISHMENT OF MUTUAL FUND BY SATYEN AND ANANDA GANGULY

Ananda Ganguly was one of the first five engineering graduates from India to join Microsoft in the late 1980's. He was a brilliant student from the Indian Institute of Technology and a friend of thirty years with Satyen and his family. Satyen and Ananda would often get together and discuss scientific or educational issues. After Ananda married, and had a family, the families were close and had great respect for each other.

Ananda played a significant role in creating Microsoft Word. Through Microsoft stock options, Ananda became a multimillionaire by the time he left Microsoft in 2008. He never became a citizen but always retained his green card status. He finally decided to go back to India to live permanently in 2012.

In about 2004, Satyen and his wife were a bit surprised and touched when Ananda's family (his wife and then eight year old daughter) requested Satyen to act as their guardian when Ananda had brain tumor surgery at Swedish Hospital. Everyone was brought close by this experience and Ananda's family stayed with the Chatterjees in the Chatterjees' home during the surgery and recovery. At first, the diagnosis was not good, but eventually Ananda recovered use of all his senses and was no longer paralyzed. After his discharge, his family returned to their home in Redmond.

DEFENDANT SATYEN CHATTERJEE'S SENTENCING
MEMORANDUM - 17
[CASE NO. CR-15-00179-TSZ]

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

In 2010, Satyen and Ananda discussed using the Learning Software Ananda had been developing. They worked together to provide software to the students in India at the Akash school with which Satyen had been working.

Ananda discussed with Satyen how he would protect his personal stock options in Microsoft by writing call options ahead of the earnings reports if he suspected that the earning reports would not be good. Satyen voiced his concerns about this practice but Ananda said that many Microsoft employees with significant stock options would frequently employ this practice and were apparently not considered "insiders." Through Ananda's knowledge of options trading, and a research paper he had compiled regarding technology investments, discussions arose about going into business together. After Ananda had left Microsoft, he was managing his multimillion dollar personal stock portfolio along with developing his Learning Software. While Satyen did not know Ananda's net worth, Ananda had mentioned to Satyen that daily fluctuations in it were about half a million dollars. Satyen thought that a one percent fluctuation, quite normal for Dow Jones, would indicate Ananda's portfolio was at least $50 million dollars. Satyen suspected it could be as high as $100 million dollars.

Originally, Ananda and Satyen had discussed the funding of a technology based mutual fund. Satyen thought that Ananda could help the mutual fund in providing analysis of potential companies in which to invest. Ananda had taken numerous economics and finance courses. Ananda also wanted to complete his Series 7 Securities License so he could take an active part as co-manager for the mutual fund which would have, eventually, a substantial amount of his personal portfolio, perhaps as much as $10 to $20 million dollars.

DEFENDANT SATYEN CHATTERJEE'S SENTENCING
MEMORANDUM - 18
[CASE NO. CR-15-00179-TSZ]

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

Between four and twelve potential active participants (not lenders) in the mutual fund were envisioned by Satyen and Ananda. Ananda was supposed to take primary responsibility for recruiting these other participants because of his contacts with other multimillionaires.

Satyen and Ananda envisioned that like most mutual funds, theirs would contain and involve trading in options, equities, and bonds. Satyen had accomplished a positive trading record for both stocks and bonds but not options. While the two moved forward attempting to create their mutual fund and recruit other investors, Ananda decided to loan $500,000 to Satyen, evidenced by a promissory note. This note was executed on June 10, 2010. The promissory note contained a 6% interest rate but also an agreement that "if the actual return of the mutual fund is more than 6%, the lender will share the extra return proportionately." The note also contains some terms relating to the setting up of collateral accounts and that the funds would not be comingled with others, all referencing the situation when the mutual fund was operational.

Ananda was well aware that Satyen was going to trade a significant portion of the funds to create the necessary trading history for options. This met with his approval as he had been very successful in options trading.

Satyen deposited a $500,000 check of Ananda's into the SCM Wells Fargo account in Seattle. It was digitally imaged and sent electronically interstate to California where it was processed and posted, a transfer which constitutes the wire fraud predicate for the Plea Agreement.

The following day, Satyen wrote a $450,000 check from a SCM Wells Fargo account into the SCM E*Trade account. The government claims it was their "comingled" with other funds but the reality is that it simply joined approximately $1,200 of SCM money that was already there. It

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

was certainly not comingled with any other participant in the mutual fund as there were no other participants in the mutual fund at this point.

Ananda and Satyen kept in close contact about how the trading was going and the last six months of 2010 were very good for SCM and its trading accounts. At the end of 2010, the account had grown in value by 10.4%.[5] As the two men anticipated that additional participants in the mutual fund would be brought into the process in 2011, they agreed to use that number to calculate the additional return above the 6% as provided for in the promissory note. Ananda was well aware of the trading in the account, that only $450,000 of his money had been transferred into it, and, like Satyen, considered the other $50,000 as available for Satyen to use as he saw fit as Satyen was personally liable on the note. The two men agreed that 8.2% would be the return paid to Ananda and eventually two checks were written to him, one reflecting an 8.2% return on the $500,000, the increased payment under the terms of the note, above the 6%. Satyen wrote a second much smaller check to compensate Ananda for the interest that Ananda felt was due him because of the time it took Satyen to issue the larger check.

It is true that Satyen made many additional withdrawals from the FCC trade account in 2010 and 2011. In addition to the concept that the money was his as he had an obligation to pay it back, the account was doing very well and he felt that he was entitled to compensate himself from it. He did not feel that somehow he was prohibited from taking profits and other funds out of it. And Ananda closely followed the account and was aware of the transfers.

In January 2011, Satyen became president of the local Bengali Society, Uttoron. The phone rang first thing nearly every morning with someone requiring assistance and Satyen allowed his volunteer efforts to distract him from trading in the market. In addition, the markets became

---

[5] In 2010, SCM reported capital gains of $34,141 on its tax return.

DEFENDANT SATYEN CHATTERJEE'S SENTENCING
MEMORANDUM - 20
[CASE NO. CR-15-00179-TSZ]

CABLE, LANGENBACH, KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

more volatile and SCM suffered enormous trading losses. As reflected in his IRS Schedule D for SCM, SCM lost $235,831 in 2011 and $53,070 in 2012. Ananda was aware of these facts, but felt he was secure because of Satyen's obligations under the note.

During this process, Ananda lost interest in obtaining a 7 Series license, lost interest in participating in the mutual fund, and indicated that he intended to move back to India permanently. The individuals which both Ananda and Satyen had contacted to participate in the mutual fund were not forthcoming. Ananda's claim that he could bring several participants to the mutual fund never materialized. By late 2011, Ananda was making repeated demands to be repaid. In 2012, Ananda was pressing Satyen for assurances that his funds were safe. At this point, Satyen made perhaps the biggest mistake of his life. In order to save face with his long-time friend, he fabricated an account statement that reflected that over $700,000 existed in the account which could be used as collateral to pay off Ananda. This was clearly a mistake. Satyen felt that it was not important because he knew he had assets available with which to satisfy Ananda and that eventually Ananda would receive his monies.[6] Notwithstanding this false assurance, Ananda obtained a deed of trust on Satyen's properties both here and in India.

Ultimately, Ananda retained attorney Tyler Moore at Lasher Holzapfel who obtained a judgment on the promissory note and filed a lien against Satyen's residence. A judgment was entered in King County Superior Court on October 31, 2013. The amount of this lien as it currently appears on the title report is $648,287.31.

The Chatterjee residence at 9652 42nd Avenue NE, has been sold for a total purchase price of

---

[6] Dealing with some of the other creditors, while Satyen did not fabricate documents, he did make statements, well after the monies had been received and certainly not contemplated at the time that he received the monies, that the funds were being treated in thus in such a fashion and were safe. These fabrications were wrong and simply acts of a prideful person who felt that he had access to funds to fully pay off all of his creditors and simply wanted some breathing space.

CABLE, LANGENBACH, KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

$885,000 to Hui-San Chung. Because of all the liens filed by Ananda and others who loaned money to Satyen, and the existence of a Wells Fargo mortgage, a short sale needs to be negotiated among the lienholders. Satyen's broker has retained civil counsel for that purpose and that process is currently underway. It is anticipated that the house sale will close in April. So as to not further delay sentencing, Satyen respectfully requests that he receive credit for having made restitution at the time of sentencing even though that sale and those restitution payments have not yet occurred.

CABLE, LANGENBACH, KINERK & BAUER, LLP

/s/ C. James Frush
C. James Frush, WSBA No. 7092
1000 Second Avenue, Suite 3500
Seattle, Washington 98104-1048
(206) 292-8800 phone
(206) 292-0494 facsimile
jfrush@cablelang.com
Attorney for Defendant

DEFENDANT SATYEN CHATTERJEE'S SENTENCING
MEMORANDUM - 22
[CASE NO. CR-15-00179-TSZ]

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on March 18, 2016, I electronically filed the foregoing with the Clerk of the Court by the CM/ECF System which will send notification of such filing to those registered to receive electronic notices by email transmission at the email addresses provided.

Annette Hayes
Justin Arnold
Robert G. Kondrat
U.S. Attorney's Office

I declare under penalty of perjury under the laws of the State of Washington and the United States that the foregoing is true and correct.

/s/Katy Albritton
Katy Albritton, Legal Secretary
CABLE, LANGENBACH, KINERK & BAUER, LLP
1000 Second Avenue, Suite 3500
Seattle, Washington 98104-1048
(206) 292-8800 phone
(206) 292-0494 facsimile
kalbritton@cablelang.com

DEFENDANT SATYEN CHATTERJEE'S SENTENCING
MEMORANDUM - 23
[CASE NO. CR-15-00179-TSZ]

CABLE, LANGENBACH,
KINERK & BAUER, LLP
1000 SECOND AVENUE, SUITE 3500
SEATTLE, WASHINGTON 98104-1048
(206) 292-8800